## Case No. 12,335.

### The SARAGOSSA.

[1 Ben. 553.] [1]

District Court, S. D. New York. Nov., 1867.

SALVAGE — CHARACTER OF SERVICE — COMPENSATION—DISTRIBUTION.

1. Where a steamer which had broken her machinery, so that it could not be used, but could have been made fit for use in a day or two, and which was making two and a half knots an hour under canvas, was towed by another steamer, for about thirty-four hours, to Fortress Monroe, and thence to Norfolk, where the salvor vessel was compelled to go for coal, and, at the time of their arrival at Fortress Monroe, it began to blow, and stormed so heavily that the latter was unable to go to sea till the second day after, and she then met with severe weather on her way to New York, by which she was somewhat injured and was also compelled to put back to Norfolk for more coal: *Held*, that neither could the fact, that the salvor vessel was saved from exposure to storm by going into Fortress Monroe, be taken into consideration to diminish her compensation for the services she rendered, nor could the storms which she afterwards met, or the injury which they inflicted upon her, be considered for the purpose of increasing that compensation.
[Cited in The New Orleans, 23 Fed. 911.]

2. The salvor vessel with her cargo and freight being worth $434,000, and the vessel saved with her cargo and freight being worth $100,000, and both carrying passengers, the court awarded $9,000 salvage.
[Cited in The Alaska, 23 Fed. 613.]

3. This sum was distributed, one half to the owners of the salvor vessel, $500 to her master, and the rest to her officers and crew, including the master, in proportion to their wages.

4. It is the policy of courts of admiralty to encourage salvage services by large, powerful, well equipped and valuable steamers, by giving their owners one-half of the compensation awarded.

In admiralty.

Richard H. Huntley, for libellants.

Beebe & Donohue, for claimants.

BLATCHFORD, District Judge. This is a libel for salvage, filed by William H. Goodspeed, owner, and George W. Ward, master, of the steamer Charles W. Lord, on behalf of themselves and of the crew of the Charles W. Lord, against the screw steamer Saragossa, her tackle, &c., and her cargo and freight money. The Saragossa was on her way from Charleston to New York. The Charles W. Lord was on her way from Galveston, Texas, via Key West, to New York.

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

On the night of the 17th of March, 1867, at about ten o'clock, the Charles W. Lord, having reached a point about nineteen miles south-east of Cape Hatteras light, had her attention attracted by the burning of blue lights to the south-east of her. She was then heading to the northward, having rounded Cape Hatteras Shoals, but, on seeing the lights, she kept off and ran down to them. She there found the Saragossa with some canvas set but not under steam. In reply to a hail, the Saragossa asked to be towed to Fortress Monroe, and said that she had broken down. The Charles W. Lord assented to taking her in tow and did so. The disabling of the Saragossa was caused by the giving way of the coupling between two sections of her shaft, which rendered her screw useless. She was making about two and a half knots an hour under canvas, and was engaged in repairing, or in making preparations to repair, the machinery. Her engineer says, that he could have repaired the break, at sea, in from twenty-four to thirty-six hours, so as to have made three and a half knots an hour under steam without canvas, and have made a port. There was a bad sea on at the time, and the wind was strong from the north-west, and the Saragossa was about five or six miles from the Gulf Stream. About half past eleven o'clock that night the towing began by a hawser run from the stern of the Charles W. Lord. For the first eight hours little progress was made, on account of the bad sea and the strong head wind. About eight o'clock on the morning of the 18th, the wind moderated, and the vessels got in under the land. They arrived at Fortress Monroe on the morning of the 19th, about seven or eight o'clock. The shaft of the Saragossa was disconnected during all the time of the towing, so that her machinery was not used. She was in good condition in all respects, except the accident to her machinery, and her sails and spars and masts were in good order. The Charles W. Lord had about seventy tons of coal when the towing commenced, and about thirty-two when she reached Fortress Monroe. She would have used from twenty-six to thirty tons in reaching New York, from the place where the towing commenced, if she had not done the towing. She was of the value of $150,000 at the time of the service, and was a new vessel. She had on board a cargo valued at $273,000, (of which $70,000 was the value of $50,000 of specie). Her freight money for the voyage was $8,700, and her stores were worth $2,500. Her cargo consisted principally of cotton, hides and wool. She had sixteen passengers. The Saragossa had a crew of thirty-seven persons and twenty-three passengers, among whom were some females. The Saragossa was worth from $45,000 to $50,000, her cargo was worth $52,000, and her freight money was $1,500.

The service rendered in this case was a salvage service, and was one of merit, and

ought to be properly rewarded. But there is nothing in the case to justify the extraordinary demand made at the trial, that the libellants should receive more than $40,000 as salvage compensation. The weather was not stormy; there was no exposure or risk of life on the part of the master and crew of the Charles W. Lord; there was no imminent peril to the Saragossa; there was no great amount of labor or skill bestowed or displayed on the part of the salvor vessel; nor was there any great length of time occupied in the service. On the other hand, the value of the property imperilled by the deviation of the Charles W. Lord from her voyage was large, and the service was rendered promptly and efficiently; and the policy of the law is to encourage salvage services by steam vessels, especially when rendered to steam vessels which are carrying passengers.

I do not consider, as an element in the salvage service in this case, any speculation, growing out of the gales which blew between the time the vessels arrived at Fortress Monroe and the time the Charles W. Lord subsequently arrived at New York. Whether the Saragossa would or would not have been able to repair her machinery before the gales came on, so as to have had its aid in keeping off from a lee shore, or in keeping her head to the wind, or whether, if she had not succeeded in repairing her machinery before the gales came on, she would or would not have been able to lay to in a gale by the use of her sails alone, are questions having too many contingent ingredients, to be considered in estimating the value of the salvage service. And, if I were to consider them, I should hold, that the weight of the testimony is, that the Saragossa could have repaired her machinery, so that she would have had the use of steam before the gales came on, and that if she had not repaired her machinery she would still have been able to lay to by the aid of her sails alone. So, also, as to the gales which the Charles W. Lord encountered on her voyage from Fortress Monroe to New York, and which caused damage to her, and which it is claimed she would not have encountered if she had not deviated from her voyage to assist the Saragossa, because she would have reached New York before the gales came on,—all such considerations are too remote to enter into the question of the compensation for the service rendered. In the case of The Emulous [Case No. 4,480], it was argued, that a storm which occurred the next day after the saved vessel and cargo reached a harbor, would have very probably occasioned their total loss if they had not then been in port. In reply to this, Judge Story says: "Admitting that to be true, still it cannot constitute a material ground, in a case like the present, for enhancing the salvage. Salvage is a compensation for the rescue of the property

from present impending perils, and not for the rescue of it from possible future perils. It is a compensation for labor and services, for activity and enterprise, for courage and gallantry, actually exerted, and not for the possible exercise of them, which, under other circumstances, might have been requisite. It is allowed because the property is saved, not because it might have been otherwise lost upon future contingencies. Subsequent perils and storms may enter as an ingredient into the case, when they were foreseen, to show the promptitude of the assistance and the activity and sound judgment with which the business was conducted, but they can scarcely avail for any other purpose. Ought the salvage to be diminished by a favorable state of the weather after the arrival in port? If not, why should it be increased by an unfavorable state of the weather? To introduce such ingredients into the element of salvage, which were neither foreseen nor acted upon, would compel the court to deliver itself over to conjectures resting on loose probabilities, the nature and extent of which could never be measured. It would be to go off soundings, to desert the facts, and to be guided by speculations always questionable and sometimes deceptive." These views are eminently sound, and have always been followed by courts of admiralty in the United States. They were applied by this court in the case of Winso v. The Cornelius Grinnell [Id. 17,883], October, 1864. In that case, a salvage service was rendered by a steamer. The steamer, in pursuing her voyage afterwards, struck, at low water, at a place where she would not have struck at high water, and it appeared that, if she had not been delayed by stopping to render the salvage service, she would have passed at high water, instead of at low water, the spot where she struck. She was injured, by the striking, to the amount of $2,500, but the court threw out all consideration of the damages caused by the striking.

In the present case, the Charles W. Lord was engaged in towing the Saragossa for about thirty-four hours, from the time she took her in tow till the two vessels arrived at Fortress Monroe. The Charles W. Lord was obliged to go to Norfolk to procure coal, and arrived there about ten o'clock a. m. on the 19th of March. When she was about to anchor the Saragossa at Fortress Monroe, she was requested by the Saragossa to tow her to Norfolk, and consented to do so, because she had to go there herself for coal. She accordingly took the Saragossa in tow to Norfolk. About the time the two vessels arrived at Fortress Monroe it commenced to storm, with snow, and about six hours afterwards to blow. It blew heavily that day, and blew a gale from the eastward that night and through the 20th and until the morning of the 21st, so that the Charles W. Lord would not go to sea. During that gale it blew so heavily that eight or ten steamships came into Hampton Roads from sea for a harbor. When the Charles W. Lord did go to sea, she encountered a gale which compelled her, after about three days and a half, to return to Norfolk for more coal. During that gale she carried away her steering gear for a time, but repaired it at sea, and suffered other damage. Now, if we could enter the region of speculation so as to take into account what might have happened to the Saragossa if she had been out in the gales which came on after she reached Fortress Monroe, we must equally speculate in regard to the Charles W. Lord. And, on the evidence, it would be reasonable to say that, in consequence of her having been delayed by towing the Saragossa, she was saved from exposure and damage, to an extent open wholly to conjecture, by not being out in the gale which commenced on the 19th. But this fact ought not to diminish the value of the salvage service she rendered; nor can the losses she did suffer in the gales she afterwards met with, before she reached New York, enhance such value. Notwithstanding the season of the year, nothing which happened in regard to wind or weather, can, in fact or in judgment of law, be reasonably said to have been foreseen, much less acted upon, during the time the salvage service was in progress.

In view of all the facts in this case, the salving vessel being a steamer, her value and that of her cargo, stores and freight money being $434,200, the risk to which she was put in reference both to herself and her cargo, the value of the Saragossa and her cargo and freight money, which was, in round numbers, $100,000, the condition in which the Saragossa was, and the nature and duration of the salvage service, I think that the sum of $9,000, or a little less than one eleventh of the value of the property saved, is a liberal and, at the same time, a fair compensation. Of this sum I award one-half, or $4,500, to the owner of the Charles W. Lord. The usual proportion given to the owner is one-third. Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, 269, 271; The Henry Ewbank [Case No. 6,376]. But that was a rule fixed in reference to sailing vessels, and the policy of courts of admiralty now is to encourage salvage services by large, powerful, well equipped and valuable steamers, by giving to their owners as large a share as one-half in the compensation awarded. The Howard, 3 Hagg. Adm. 256; The Earl Grey, Id. 363; 2 Pars. Mar. Law, bk. 3, c. 7, p. 622, note 7. Of the remaining $4,500, I award $500 to the master of the Charles W. Lord, on account of his responsibility in undertaking the salvage. The remaining $4,000 will be distributed among her officers and crew in proportion to their respective monthly wages, the master sharing pro rata in the $4,000, in addition to the $500 specially allotted to him. The apportionment will be made by a commissioner,

on a reference, unless it is agreed upon by the parties. The costs of the suit, also, must be paid by the claimants.