## THE ALASKA and her Cargo.[1]

*(District Court, S. D. New York. April 17, 1885 )*

1. SALVAGE—RUDDERLESS STEAMER.

    The steamer Alaska, of the Guion line, while on one of her regular voyages from Liverpool to New York, encountered heavy weather, and when she was some 600 miles from New York, her rudder was found to be broken and unserviceable. She accordingly lay to, while her captain exhibited signals of distress, and attempted various expedients for steering her, none of which proved available. At the end of two days the steamer Lake Winnipeg, of the Beaver line, observed the signals and came to her assistance. At an interview between the captains of the two steamers, it was agreed that the captain of the Lake Winnipeg should assist the Alaska to New York by allowing herself to be towed and to serve as a rudder for the Alaska, which was the faster steamer. Chains were passed from each stern-quarter of the Alaska to the bows of the Lake Winnipeg, distant some 90 fathoms, in such a manner that the Lake Winnipeg, by altering the direction of her bow, would slue the stern of the Alaska to one side or the other, and thus keep her head pointed in the required direction. The vessels proceeded in this way to New York, with the exception of some 149 miles, which the Alaska during 18 hours of one day ran alone, keeping in the desired direction by means of her sails. On the fourth day they arrived in New York; and on the day after arrival, and without making a previous demand, the owner of the Lake Winnipeg filed a libel for salvage. The Alaska, with her cargo and freight, was valued at $1,041,542, while the Lake Winnipeg, her cargo and freight, were worth between $325,000 and $350,000. *Held,* that $26,039, or 2½ per cent. of the value of the Alaska, and cargo was a proper salvage award. *The Great Eastern,* 3 Moore, P. C. (N. S.) 31. The facts of her salvage case stated.

2. SAME—AMENDMENT TO LIBEL—GENERAL REPAIRS TO SALVING VESSEL— EVIDENCE.

    In addition to salvage, the libelant claimed a large sum for general damage to the Lake Winnipeg. After the return of this vessel to Liverpool from New York, she was put upon a dock; and it was alleged that various injuries were then discovered, which were claimed to have been the result of her service to the Alaska. The original libel was thereupon amended on the trial to take in this claim. *Held,* that such injuries, if proved, might be recovered; but that the evidence was insufficient to charge the Alaska specifically with the general repairs referred to. But in fixing a gross award full consideration was given to the Lake Winnipeg's liability to general injury in such a service, and an allowance made sufficient to cover all such damage as might naturally and reasonably be deemed incident to her peculiar service.

3. SAME—LIABILITY OF VESSEL FOR SALVAGE DUE BY CARGO.

    A ship is not liable for the proportion of salvage due from her cargo.

4. SAME—COSTS.

    Respondents claimed that costs should not be allowed (1) because there was no demand before suit; and (2) because excessive bonds for 20 per cent. of the

[1] Reported by R. D. & Edward Benedict, Esqs., of the New York bar.

value of the cargo were taken. *Held*, that the circumstances of this case were so peculiar, and a claim of salvage necessarily so indefinite,.that a previous demand was immaterial. It was necessary for the libelant to file its libel at once to enforce its claim against the cargo before it was delivered. Also, though stipulations were taken on account of the cargo to the amount of 20 per cent., there was no evidence of any objection to giving such stipulations, and they were taken upon the simple written obligation of the insurers, without sureties. Costs were allowed, with the exception of the depositions taken in Liverpool as to the alleged general damages.

In Admiralty.

*Foster & Thompson,* for libelants.

*Wilcox, Adams & Macklin,* for the Alaska.

*Scudder & Carter* and *Geo. A. Black,* for Atlantic Mutual Insurance Company.

BROWN, J. · The libel in this case was filed to recover compensation for salvage services, rendered by the libelant's steamer Lake Winnipeg to the steam-ship Alaska, in assisting her to New York, from the fifth to the eighth of February, 1885. The Alaska is an iron passenger steam-ship, of the first class, having but four equals afloat. She is of about 6,930 gross tons, 525 feet long, by 50 feet deep. Her power is 1,800 nominal, working up to 11,300 horse-power, and her ordinary full speed is from $17\frac{1}{2}$ to 18 knots per hour. She left Liverpool for New York on January 24th, with a cargo of fine goods, and 291 passengers. After three or four days of fair weather, during which she made her usual course, she encountered one of the severest of the Atlantic storms, lasting from Tuesday, the 27th, until Saturday, the 31st, when the weather became moderate, and so continued, with the exception of an ordinary gale on Monday, until Tuesday, February 3d. About 8 o'clock in the morning of that day, her rudder was found to be broken and unserviceable. Immediate efforts were made to repair and use the broken rudder, and when this was found to be impracticable, the use of heavy stream cables running aft of the ship were tried as a substitute for a rudder; but it was found insufficient for a ship of her great size. All of Tuesday and Wednesday were employed in these efforts, the ship meantime lying to, and drifting some 50 miles to the eastward. Three black balls were exhibited by day, and three red lights by night; and rockets were also sent up to attract attention, and call in the aid of vessels that might come within sight. About 8 o'clock in the evening of Wednesday, the Lake Winnipeg, bound from Liverpool to New York, observing these signals nearly abeam, and about 12 or 13 miles distant to the northward, bore down towards the Alaska, and came to at a little distance on her starboard side. Capt. Murray of the Alaska thereupon went in a small boat to the Lake Winnipeg, and arranged, in an interview with Capt. Gould of the latter, that the Lake Winnipeg should assist him in proceeding to New York by allowing the use of the Lake Winnipeg as a rudder, to be fastened astern of the Alaska.by means of two chain cables extending from

each side of the stern of the Alaska to the windlass of the Lake Winnipeg. The vessels at this time were about 600 miles from New York, and about 190 from Halifax.

On account of the great size of the Alaska, Capt. Gould was at first unwilling to undertake to proceed with the Alaska to New York, but wished to go to Halifax instead; but upon the urgent request of Capt. Murray, after conference with his officers, he agreed to go with her to New York. It was agreed to use the cables of the Lake Winnipeg; and thereupon, about 10 o'clock, Capt. Murray returned to the Alaska. After getting in his own cables, which were still out, he exhibited a blue light, the signal agreed upon, whereupon the Lake Winnipeg came up astern within 50 or 75 fathoms' distance. A small boat was then manned and sent out from the Alaska, with ropes, to the Lake Winnipeg, where the ropes were bent upon the cables, which by that means were hauled to the Alaska by her crew, and made fast to the stern bullards of the Alaska, one upon each side. The length of the cables between the two vessels was about 90 fathoms. On the Lake Winnipeg, they passed through the hawse-pipe on each side, through a "compressor," and thence to the windlass where they were attached. A compressor is a somewhat recent device, placed a little forward of the windlass in the direction of each hawse-pipe, designed to keep the hawser in place, and to steady and relieve in some measure the strain on the windlass.

The officers and crew of the Alaska were occupied until about 4 o'clock on the morning of Thursday, the 5th, in getting the cables aboard and in readiness. The ordinary full speed of the Alaska being from 17 to 18 knots, and that of the Lake Winnipeg from 10 to 12 knots, it was arranged that the speed of the Alaska should be reduced for the rest of the voyage. The arrangement with the engineer's department was such that full speed should consist of 46 revolutions only per minute, instead of 61; half speed, 36 revolutions, instead of 45; and slow, 26 revolutions, instead of 32. To prevent any undue strain upon the cables before the action of the two vessels was fully proved, the Alaska started up moderately, and proceeded for a time under the reduced half speed only; and the speed of the Lake Winnipeg was regulated so as to approach as nearly as possible the speed of the Alaska, keeping the cables moderately taut. All orders for steering were given from the Alaska by signals. If the Alaska wished to veer to starboard, the head of the Lake Winnipeg was put to port so that she would go off the port quarter of the Alaska, and thereby, drawing the Alaska's stern to port, direct her head to starboard, as desired. And, *vice versa*, if the Alaska wished to go to port, the Lake Winnipeg was steered to starboard. The direct course for New York was about W. $\frac{1}{2}$ N.

By the above arrangement the vessels proceeded without difficulty in the desired course, and the Alaska was soon put at her reduced full speed. During the 19 hours following, up to 11 o'clock of Thurs-

day night, they made about 211 miles, when the wind having again increased to a moderate gale from the northward, it was deemed prudent, to prevent the possible parting of the cables, to go "dead slow;" i. e., just enough to keep headway on, or about two to three knots per hour. This was maintained until about 4 o'clock in the morning of Friday, the 6th, when the wind and sea having moderated, the Alaska proceeded at her reduced full speed as before. During the following 13 hours, up to about 5 o'clock P. M. of that day, they made about 138 miles, when the weather again becoming boisterous, with thick snow, making it difficult to see signals, the speed of the vessels was reduced to "dead slow" as before, namely, two or three knots only. In the mean time it had been arranged by signals that a green light exhibited by the Lake Winnipeg should direct the Alaska to go ahead at full speed; a blue light, that she should stop.

The testimony showed that the effect of a high wind upon a propeller not kept to her course is to send her bows off some 10 or 12 points from the wind, on account of the greater free-board forward. The wind at this time being to the northward, the Alaska, while going "dead slow" only, gradually fell off to about a south-westerly direction. Between 11 and 12 P. M. the wind moderated, so that it was possible to proceed. According to the testimony of the Alaska's witnesses, the Lake Winnipeg, by some maneuver to the starboard, swung the stern of the Alaska still further to the southward, so that her head went round as far as S. S. E., bringing the wind on her port side. The Winnipeg afterwards went upon her port quarter to slue the Alaska's stern to the eastward, and in a measure did so. At 11:53 the Alaska was put at half speed, and shortly afterwards, as it would seem from the engineer's log, a signal light was exhibited from the Lake Winnipeg, which numerous witnesses from the Alaska testify was a green light; several witnesses from the Lake Winnipeg testify with equal positiveness that it was a blue light. The Alaska, understanding this light as a signal to go ahead full speed, gave this order to her engineer at 12:10; and she was accordingly gradually brought to her full speed of 46 revolutions. Shortly afterwards both cables parted, and the Alaska's engines were immediately stopped at 12:17. One cable was found snapped at the stern of the Alaska, and the other at the bow of the Lake Winnipeg. The cable hanging from the Alaska was hauled in and recovered by her. The Lake Winnipeg was unable to haul in the cable hanging from her bow; and after several hours' attempt to do so, slipped it, and it was lost. By the parting of this cable, and the rebound of the short piece on the Lake Winnipeg, one of her compressors was damaged, and the steam-gear of the windlass also so much damaged that it could not be used. On Saturday morning, at about day-break, the Alaska, after hauling in the cable, and the wind being favorable, proceeded towards New York without the Lake Winnepeg in tow as a rudder, but signaled the latter not to abandon her, to which the latter by signals agreed.

The evidence shows that a propeller, when under suitable headway, naturally runs up head to the wind; and in like manner, under reversed engines, will go up stern to the wind's eye. When the wind is anywhere forward of abeam, sails may be made use of, and so trimmed that, in combination with some changes in speed, a steamer can be kept within one or two points of her desired course, making, not a straight course, but a somewhat zigzag path towards her destination. When the wind is aft of abeam, if she has no temporary rudder, she must lay to; and if upon a lee shore, she could crawl off by reversing and going into the wind's eye. During Saturday, the wind being favorable, the Alaska proceeded on alone, using her sails as above stated, from about 4 A. M. until about 10 P. M., making 149 miles. The Lake Winnipeg at about the same time that the cables broke, had one of her feed-pumps broken, occasioned, as it is said, through the "racing" of the engine, upon going astern, resulting in the loss of two knots' speed. She pursued the Alaska during Saturday as fast as she was able, being sometimes nearly hull down. About 10 o'clock, the wind having died away, and the Alaska being, therefore, unable to steer her course, the remaining cable was again sent aboard the Lake Winnipeg, as soon as she had come up, and made fast as before. They were then about 175 miles from Sandy Hook. They got under way at about one and a half o'clock on Sunday morning, and arrived inside of Sandy Hook at about 4 P. M., having taken a pilot aboard off Fire island at about noon. The Lake Winnipeg then left her, and proceeded up the bay; and the Alaska was subsequently taken by 10 tugs to her wharf.

The Lake Winnipeg is an iron-screw propeller, about 325 feet long and 3,300 tons gross tonnage, belonging to what is known as the "Beaver Line," running from Liverpool to Montreal in summer, and to New York in winter. Her value at this time was about $250,000, and her cargo about $95,000. Besides her master, she had 3 officers, a chief engineer and 4 assistants, and 46 other men, forming the ship's company. Upon this trip she had 3 saloon passengers, and 21 steerage passengers. She left Liverpool on the afternoon of January 22d, passed through the hurricane in the succeeding week with difficulty, but without apparent serious injury; and, but for the detention in assisting the Alaska, would have reached Sandy Hook on the morning of February 7th, instead of the afternoon of February 8th.

The libel was filed on the eleventh of February, the day after the Alaska reached her dock. The vessel being in custody and not bonded, the taking of testimony was immediately commenced, and a large mass of evidence has been taken. On the thirtieth of March, upon affidavits showing that the Lake Winnipeg, after her return trip to Liverpool, on being put upon the graving dock, had been found to have sustained considerable damage, said to be attributable to her service to the Alaska, depositions were ordered to be taken before the American vice-consul there on that subject, and the log of the Lake

Winnipeg upon her return trip to be produced. The evidence thus taken was received during the hearing of the cause, and an amendment to the libel allowed, alleging damages received from rendering the services to the amount of some £7,500.

The principal contention in the case has been as regards the basis upon which compensation for the Winnipeg's services should be awarded. The libel alleges the case to be a very meritorious salvage service; that the Alaska when reached by the Lake Winnipeg "was virtually at the mercy of the winds and waves; that in the course of the efforts to rescue her, and during the gale of Thursday night, the vessels became unmanageable and were stopped; that the Lake Winnipeg was in constant danger of collision; that it was necessary to watch every motion of the Alaska, and to work the helm and engines of the Lake Winnipeg accordingly; that the following night, during the gale with snow, the most unremitting diligence was required from the Lake Winnipeg to prevent a collision between the two vessels, which would have resulted in the foundering and total loss of both; that but for the libelant's services the Alaska would have been exposed to great risk of total loss, and would probably have been totally lost; and that the value of the Alaska and her cargo was upwards of $1,250,000."

The answer avers in substance that the Alaska, though without a rudder, was in no danger; that in requesting the Lake Winnipeg to serve as a rudder, "the sole purpose of such request was to accelerate the passage to New York;" that though the progress of the Alaska was retarded through the want of a rudder, yet that "no danger was apprehended by either her officers, passengers, or crew, nor did any danger at any time exist;" that neither of the vessels was at any time unmanageable, and avers that "no collision, with proper precaution, could have happened then, or at any time, and that after the Lake Winnipeg was attached, the Alaska's engines kept working slowly ahead, so as to prevent any possibility of accident."

The Alaska, it is urged, was at no time in any danger, or even any reasonable apprehension of danger, notwithstanding the loss of her rudder, because, among the numerous devices that may be resorted to for steering purposes, some would certainly have been found to answer the purpose, although the means tried on the first two days had proved unsatisfactory, those means having been first tried, because, if successful, they would have permitted the Alaska to proceed under full speed; and, *second*, because even without a rudder, the vessel was not unnavigable, but could have made her desired course whenever the wind was forward of abeam; and whenever not favorable to her progress, she could, by backing, at all times have kept out of danger, and thus in time have reached port. The evidence showed one or two instances of steamers navigated in this manner. Capt. Price, on a passage from Melbourne to England, in an iron steamer of 3,000 tons burden, lost his rudder while running south of New

Zealand, and brought his ship 14,000 miles safely around Cape Horn to England, with the use of a temporary rudder, consisting of two pieces of timber lashed together. Capt. Sumner, in April, 1871, master of the steamer Virginia, of the National line, 3,500 tons, lost his rudder in a gale, about 1,100 miles from New York, and arrived at Sandy Hook on the 18th without assistance, using a hawser and a spar tow, but "found the head sails set back of more service than either, on the average." Capt. Kemble, in command of the wooden steam-propeller Knickerbocker, of the Cromwell line, 1,150 net tons, in a voyage from New Orleans to New York, in April, 1884, lost his rudder at 3 o'clock in the afternoon of Sunday about 150 miles S. S. W. of Hatteras. His course was N. E. and under favorable winds from that direction he came within 100 miles of Sandy Hook by the use of his propeller with sails, in the manner above described, without any rudder, and without loss of time. The weather then becoming mild, he got in place a temporary rudder made from spars and spar lumber, with which he reached New York some 16 or 17 hours only behind time.

These instances are sufficient to illustrate, what is doubtless true, that a steamer, in other respects staunch and well equipped, though of the size of the Alaska, is not in a desperate situation from the loss of her rudder merely, and in abundant sea-room is not in immediate danger. In the numerous cases of salvage reported, very few are found arising upon a loss of the rudder only. It is, perhaps, a fair inference from this circumstance that, in most cases where a rudder has been lost, some of the many devices which are available for steerage purposes have been successfully employed, so as to avoid calling in salvage assistance. One case of this character, that of *The Dido*, 2 Paine, 243, arose in this district some 50 years ago, in which, upon appeal to the circuit court, a decree of BETTS, J., in the district court, amounting to $5,000, was reversed by Mr. Justice THOMPSON, who intimates the opinion that the brig, being complete in all other respects, and not being unnavigable through the mere loss of her rudder, was not liable for salvage service on being towed in. "If the vessel was navigable so as to be able to avoid any threatened danger, although navigated with greater difficulty and delay, it ought not to be considered a case for salvage." The case, however, was not finally decided upon this ground. The brig had been taken in charge by the libelants, who were pilots, at a point about 25 or 30 miles from Sandy Hook, and about 10 miles distant from shore, and they had towed the vessel into the harbor. They afterwards, by mutual agreement, submitted the question of their compensation to the board of wardens, in accordance with the agreement between the captain and the pilots when they took charge of the ship. The wardens had allowed $162.50. The libelants, dissatisfied, brought a suit for salvage in the district court, where a salvage award was allowed. Upon appeal, the award of the board of wardens only was allowed,

on the ground that when the service was entered upon, neither party understood or intended it to be a salvage service. In the case of pilots it is well settled that salvage compensation will not be allowed them except in extraordinary cases of difficulty, where their services are clearly outside the sphere of their official duties. *Hobart* v. *Drogan*, 10 Pet. 108; *The Æolus*, L. R. 4 Adm. & Ecc. 29; *The John Andries*, Swab. 226, 303. It was upon this principle, and on the understanding of the parties themselves, that the judgment in the case of *The Dido* was finally rested.

A later case, very conspicuous at the time, of a salvage award growing out of the loss of a rudder, is the case of *Towle* v. *The S. S. Great Eastern*, which also arose in this district, and was heard before SHIP-MAN, J., whose opinion is reported in full in the New York *Transcript* of November 13, 1864. The Great Eastern left Liverpool, September 10, 1861, for a voyage to New York, with about 400 passengers and an equal number of officers and crew. When two days out, and about 280 miles west of Cape Clear, in a heavy storm, her paddle wheels were carried away. But she also had a screw propeller uninjured, by which she could make very good headway. On the night of the 12th she rolled with such violence in the trough of the sea as to carry from side to side of the ship all the movable objects on her deck and in her cabins. Much of her furniture was destroyed, several of her crew and passengers injured, and a great part of her luggage drenched and crushed into a mass of worthless rubbish. During that night her rudder-shaft had been twisted off below all the points of connection with the steering-gear, and the ship lay helpless in the trough of the sea, rolling heavily with every swell. Her sails were blown away in a subsequent attempt to control her movements by them, and no means were left by which her head could be brought up, and her position on the sea changed. She was as unmanageable as if her rudder had been entirely gone. The only way of getting any control of the motions of the ship was to secure some kind of efficient steering-gear by attaching it to the rudder-shaft below the point of fracture, and connecting it with the wheel. During Friday and Saturday the weather had moderated. During these two days Capt. Walker and the chief engineer had tried various devices for making use of what remained of the rudder, as well as independent expedients for steering the vessel; but all without success. The libelant was a civil and mechanical engineer, who was a passenger on the ship. He had been watching the efforts for her relief, and had formed a plan of his own. This plan was at first rejected by the captain, but about 5 o'clock on Saturday afternoon, having apparently lost confidence in his own expedients, he authorized the libelant to try his plan, and placed a sufficient number of men at his disposal. His work was completed at 5 P. M. the following day, and was found to be entirely successful. The plan adopted was the use of chains in connection with the shaft and the rudder in its disabled condition. During the same time some inde-

pendent means were also employed by the captain and officers in other ways towards the same end. But the court found that the efficient means were those adopted and carried out by the passenger.

Upon the libel for salvage services not much question seems to have been made that the service itself fell within the description of salvage services. The court, in reference to this point, say: "That the peril of the ship was great, and her position critical, in the judgment of her commander, is evident from the fact that he intrusted to this stranger a work, upon the result of which her salvation depended, and which for two days had utterly baffled him and his engineers." The chief point in litigation was whether the libelant, being a passenger, was entitled to claim a salvage reward. The authorities on this subject are fully reviewed by the court, and the conclusion arrived at that, though passengers are required to do ordinary work, such as pumping, in aid of a ship in distress, without any claim for compensation, yet they may justly claim salvage for services of an extraordinary character beyond the line of their duty, such as mere ordinary service in pumping, or working the ship by the usual and well-known means; and $15,000 were, therefore, awarded to the libelant. See *The Connemara*, 108 U. S. 352, 358; S. C. 2 Sup. Ct. Rep. 754. As the newspaper report of this case is not easily accessible, I have quoted from it more largely, considering its interesting and novel features, than I should otherwise have done.

From the widely dissimilar cases of *The Dido* and *Great Eastern*, it is apparent, what is indeed otherwise sufficiently obvious, that the mere loss of the rudder is not in itself a conclusive circumstance as to the danger in which a ship should be regarded, and that its importance depends on the other circumstances of the case. Chief among these are the size of the vessel herself; for, upon this mainly depend the readiness, the effectiveness, or the difficulty with which temporary substitutes may be supplied. Next are the other means of control at command, the season, the weather, and the situation of the ship. With small vessels, there is usually no difficulty in supplying speedily some efficient substitute for a lost rudder. In a vessel of the size of the Great Eastern, whose tonnage is not stated in the opinion above referred to, but which in another case—*The Great Eastern*, 3 Moore, P. C. (N. S.) 31—is stated to have been 13,344 tons burden, it may be very difficult or impossible to supply an effective temporary rudder in time to avert disaster. Upon the more modern views of the nature of salvage services, I think a vessel of any considerable size that had lost her rudder would be deemed a proper subject of salvage. In the case of *The Anders Knape*, a steam-ship of but 401 tons, (4 Prob. Div. 213,) Sir Robert Phillimore says: "This vessel had been on the sand and had sustained some damage to her rudder. She was, therefore, in a condition in which salvage service might be rendered to her."

The Alaska, though of considerably less tonnage than the Great Eastern, yet, in comparison with vessels of ordinary size, somewhat

approached her in magnitude, being somewhat above half the latter's tonnage. That there was no small difficulty in providing suitable steerage appliances after the loss of her rudder is sufficiently evident, not merely from the great size of the ship, but also from the loss of two days' valuable time in the unsuccessful effort to provide them. There were doubtless various other expedients that might have been tried; and I have little doubt that sooner or later, had no assistance been availed of, her master would have found some means of steering her. But in the mean time she was clearly in an unseaworthy condition. She would be exposed, therefore, to more than ordinary hazards in the severe gales incident to the most boisterous season of the year. The evidence shows, it is true, that with favorable winds forward of abeam, a propeller may pursue her course through the use of her sails and her propeller so as to make a zigzag course towards her destination. That this cannot, however, be safely relied on in a severe gale by a very large steamer is rendered pretty certain from the experience of the Great Eastern, whose sails in a similar attempt were blown away. Nor could she trust to herself at all in a calm, or under the influence of gales near a land-locked coast, or in the vicinity of reefs or shoals, or when subjected to tides and currents near land, since, under these circumstances, she would have no means whatever of avoiding them; nor had she any available means of avoiding collisions with other vessels.

Upon the question whether the Alaska was in a fit condition to pursue her voyage towards New York, at that season, without any temporary rudder, I must find that the conduct and judgment of Capt. Murray, under the circumstances, furnish the most conclusive evidence. He was within 600 miles of New York; only about 32 or 33 hours' distance with the Alaska's usual speed, and scarcely more than 48 hours' distance under half speed of her engines. On Tuesday morning, when the loss of the rudder was discovered, the wind was W. N. W., and, according to her log, continued from that to W. by N. during nearly all of Tuesday and Wednesday. The wind, therefore, was from a favorable quarter. The captain was most anxious to reach port speedily. Had it been deemed safe or prudent to proceed towards the coast without a rudder, by a zigzag path, through the use of the sails and the propeller, it cannot be doubted that he would have done so. That he did not proceed, but spent two days, in the mean time drifting E. S. E. some 53 miles, in the attempt to supply a temporary rudder, I must hold to be conclusive proof that it was not safe or expedient to do so with a vessel like the Alaska at that season. Her situation, therefore, was that of a great and valuable ship disabled in an essential part, and unable, in the judgment of her most competent commander, to proceed with safety towards her port of destination until the want of a rudder was in some way supplied; while the means and the time necessary to supply this want were, to some extent at least, uncertain. That such a vessel, in such

a situation, was a proper subject of salvage assistance I cannot doubt; nor that the service rendered was one of no inconsiderable merit. In the case of *The Reward*, 1 W. Rob. 177, Dr. LUSHINGTON, in distinguishing a towage service from a salvage service, says:

"Mere towage service is confined to vessels that have received no injury or damage, and mere towage reward is payable in those cases only where the vessel receiving the services is in the same condition she would ordinarily be in without having encountered any damage or accident."

It was upon this distinction that in the case of *The Emily B. Souder*, 15 Blatchf. 185, only a towage reward was allowed; because the steam-ship, when taken in tow from 50 to 100 miles distant from New York, was in the same condition as to her motive power as when she left St. Thomas, being under no additional disability, and desiring only to expedite her progress.

It is urged that in the present case Capt. Murray, when the services of the Lake Winnipeg were secured, desired only to expedite his progress to New York; and in one sense this is doubtless true. But the ship was not in the same condition in which she had hitherto been; and she had been for two days drifting to the eastward because she could not proceed with safety. Exhibiting signals, flash-lights, and rockets, to attract the attention and aid of vessels within sight, are further strong evidences of the Alaska's need of assistance. Such signals are always held significant of the intention of the parties. *The Jubilee*, 42 Law T. (N. S.) 594. To disregard such signals is a gross breach of maritime obligation; to exhibit them when there is no need of assistance would be a wanton breach of good faith upon the sea. The signals in this case were given, as the sequel shows, not to attract attention merely, but to obtain help. To tow or to steer another vessel that is under no necessity whatever of such a service, but desires it only for her mere convenience in reaching port a little earlier, is wholly outside of the business of such vessels as the Lake Winnipeg at sea. Such service in departing from the proper business of her voyage is not expected to be asked or given, except under some reasonable apprehensions of difficulty or danger; and that is a sufficient basis for a salvage award. In the case of *The Alphonso*, 1 Curt. 376, 378, CURTIS, J., says:

"The relief of property from an impending peril of the sea, by the voluntary exertions of those who are under no legal obligation to render assistance, and the consequent ultimate safety of the property, constitute a case of salvage. It may be a case of more or less merit, according to the degree of peril in which the property was, and the damage and difficulty of relieving it. But these circumstances affect the degree of the service, not its nature.'

In the case of *The Charlotte*, 3 W. Rob. 68, 71, it is said:

"It is not necessary that the distress should be actual or immediate, or the danger imminent and absolute. It is sufficient if, at the time the assistance is rendered, the ship has encountered any damage or misfortune which might possibly expose her to destruction if the service were not rendered."

This expression of the law has been since repeatedly affirmed and followed. *The Strathnaver*, L. R. 1 App. Cas. 58, 65; *The Saragossa*, 1 Ben. 551, 553. So, in the case of *The Raikes*, 1 Hagg. 247, it was held to be sufficient that the vessel is "in a situation of actual apprehension, though not of actual danger." *The Phantom*, L. R. 1 Adm. & Ecc. 58; *The Joseph C. Griggs*, 1 Ben. 81. And "the degree of danger," says Dr. LUSHINGTON, "is immaterial in considering the nature of the service." *The Westminster*, 1 W. Rob. 232. In the recent case of *McConnochie* v. *Kerr*, 9 FED. REP. 50, where the services were denied to be of a salvage character, this court, upon a careful consideration of the subject, defined a salvage service as "a service that is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger, either present or to be reasonably apprehended;" and a towage service as "one which is rendered for the mere purpose of expediting the voyage, without reference to any circumstances of danger." Affirmed on appeal. 15 FED. REP. 545. The same views are clearly expressed by BLATCHFORD, J., in the case of *The Leipsic*, 10 FED. REP. 585, 589.

In endeavoring to fix a suitable salvage reward for the services rendered, all the circumstances of both vessels have to be considered.

1. The Alaska was not at the time in any immediate peril; although, as the log shows, the sea was high, and she was lurching heavily. She was staunch in every respect, and there appears to have been no apprehension on the part of her officers, crew, or passengers of any immediate danger. During the two days, while the different devices for steering were tried, the ordinary life of the passengers, with their games and pastimes, went on as usual. There is no evidence of any lack of confidence in the master's ability, sooner or later, as I have said, to reach New York or some other port without assistance, either by some successful expedient for steering, or by proceeding on in favorable weather without it. The small stock of surplus coal, however, leaves a steamer like the Alaska no great latitude for experiments, or for proceeding long much otherwise than directly upon her course. But it has been held in many cases that the ability of steamers to reach some port by sail does not prevent a towage service from receiving a suitable salvage reward; although the ability of the ship in this respect bears directly upon the amount awarded. See cases of *The Saragossa*, *The Colon*, and other cases *infra*, 613 *et seq*.

The loss of the rudder to a vessel like the Alaska was certainly a serious loss. This loss might, perhaps, have been supplied; but until it was supplied she was unable to proceed with safety, unless attended by a companion to assist her in case of need. In the mean time, through her temporary disability in the most boisterous season of the year, she was subject to liabilities of additional disaster or accident greatly beyond the perils incident to her ordinary condition. Until effective steering appliances were obtained, although she was

not in immediate danger, there was, in my judgment, reasonable apprehension of danger, and that in no small degree. Moreover, the business interests of the ship, and of the line of which she was a part, as well as the comfort of her passengers, demanded that she should reach port as speedily as possible, without exposure to the delays and the perils of a reliance upon her own unaided and uncertain efforts. It was in this situation that the assistance of the Lake Winnipeg was urgently sought. With her, as an escort merely, ready to give aid when needed, the Alaska might, perhaps, with favorable winds, have safely gone on, steered by her sails, as she was steered all day Saturday. Had she, with such winds and such an escort, reached port safely, without any need of attaching the Lake Winnipeg as a rudder, the Lake Winnipeg would still have been entitled to some salvage award for thus attending and standing by; because her presence would have enabled the Alaska to do what she could not otherwise safely have ventured to do, viz., take the chance of the winds and weather in approaching the coast from her position at that season. Instead of adopting this course, the Lake Winnipeg was attached at once on tow of the Alaska, and put to service as a rudder. A sailing vessel, it is said, might have been used for the same purpose. If so, a sailing vessel would evidently have been less convenient, and less expeditious; and the experience of the Chateau Margaux, about a year ago, as reported, would indicate that a sailing vessel could not certainly have been relied on for such a purpose.

2. The services of the Lake Winnipeg, as a rudder made fast to the Alaska by two cables, were by no means free from danger. The situation of vessels in tow, one of another, upon the ocean, in tempestuous weather, is always attended with danger. Constant vigilance is necessary to avert it. The evidence shows unremitting care, and the necessity of frequent maneuvering of the Lake Winnipeg in this service. In the case of *The Daniel Steinman*, 19 FED. REP. 918, 921, BENEDICT, J., observes: "In such a service, care and watchfulness will not always prevent disaster;" and Sir ROBERT PHILLIMORE, in deciding the case of *The City of Chester*, 26 Mitch. Mar. Reg. 111, says: "It is well known to the elder brethren that in all these cases of large steam-ships rendering services to each other there is very great danger, and they will require skillful navigation to avoid it." An instance of damage by collision during a salvage service, and of a counter-claim in consequence, is found in the case of *The Baltic*, L. R. 4 Adm. & Ecc. 178.

In this case the sea had been high, and there was still a heavy swell when the service of the Lake Winnipeg commenced. On Thursday night, and again on Friday night, there was a sufficient gale with head winds to make it prudent, if not actually necessary, for the ships to lie to. The Lake Winnipeg stopped her engines, and the Alaska proceeded at the rate of but two or three knots; only sufficient to keep the cables taut. Part of the time on Friday night there was

snow, so that the signals could be discerned with difficulty. The evidence on the part of the Lake Winnipeg shows constant attention to the engines, and the frequent changes that were necessary in her management. Her commander had little rest during the entire service, and the regular watches were much broken up. On Friday night, shortly after the vessels had resumed their course, the cables parted. The evidence leaves some doubt as to the circumstances that led to this accident. But there is no doubt that there was a misunderstanding between the two vessels as to the signal intended to be given. A green light was seen by the Alaska, when a blue one was intended to be exhibited by the Lake Winnipeg. Had there been a misunderstanding in the opposite direction, a much worse disaster than the breaking of the cables might have happened. If no error or mistake were made, there was not, indeed, great danger. But the Lake Winnipeg, in undertaking this service, was subject to the great dangers that might easily and naturally happen through mistakes or errors notwithstanding the best intended efforts.

3. The Lake Winnipeg with her cargo was of the value of $325,000 to $350,000. While rendering this service to the Alaska she sustained some undoubted injuries and losses, viz.: the loss of her chain cable, damage to her windlass and hawse-pipe forward, and to one feed-pump in the engine department. These losses and injuries were not serious or of any very great value. Compensation for such losses and injuries as immediately and plainly grow out of the salvage service is always made in some form, either by a specific allowance in addition to the salvage award, or by taking it into consideration in fixing a gross sum. Besides these certain items of loss, a large claim has been presented, not in the original libel, for alleged additional injuries of a more general character, through general strain of the Lake Winnipeg, as shown by the starting of some of the plates and waterways amid-ships, and various other general injuries, and need of general repairs about her stern and rudder, and in the engine-room and machinery. These general repairs were only found necessary upon a survey of the Lake Winnipeg at Liverpool after her homeward trip next subsequent to her arrival with the Alaska at New York. They are alleged to have been the result of her services to the Alaska, and they have caused me considerable embarrassment.

It is not until recently that any such consequential injuries of a general nature have been made the subject of a claim for specific compensation. The difficulty of proving such specific injuries of a general character, and of distinguishing them from the perils of the sea proper, is very great. In the recent case (1884) of The City of Chester, L. R. 9 Prob. Div. 182, specific evidence of such general injury was rejected altogether in the court below; but in the gross award to the ship allowance was made for such liability to injury. On appeal, the evidence was held competent; but the libelant was put to his election to accept the gross award of £4,500 to the ship, as made

by the court below, or else to take £1,000 only as salvage reward, together with such further particular damage, as he could prove arose from the salvage services. *Bird* v. *Gibb*, (*The De Bay*,) L. R. 8 App. Cas. 559. While the subsequent need of these general repairs to the Lake Winnipeg is not doubted, the evidence that it arose through the aid rendered to the Alaska rests wholly upon the testimony of surveyers, inspectors, and the experts who examined her on the graving dock at Liverpool, and who gave their testimony there. Several of these witnesses on the part of the libelants, on their direct examination, testify that in their judgment these injuries, taken as a whole, are not such as would naturally be expected through heavy weather alone, but are to be ascribed to the unnatural strain, twisting, or torsion to which the Lake Winnipeg was exposed while her head was held, as it were, in a vice, by the cables attached to the Alaska, in the high seas, and unable to accommodate herself to the waves by her natural freedom of motion. Still, the judgment of these witnesses appears to be rather a theoretical judgment than to rest upon any proved facts. The careful cross-examination of these witnesses sufficiently discloses the uncertainty that attends their evidence and their opinions on this subject. The examination and survey made by them at Liverpool seem also to have been made for the purpose of procuring evidence of this character to be used against the Alaska; and yet no notice of this survey was given to her owner or agent there, nor had he any knowledge of it, or opportunity to make examination. One of the inspectors thus employed by the libelants for the purpose disagreed with the others, and his testimony contrary to the rest was given on behalf of the respondents. Moreover, the log of the Lake Winnipeg shows that upon her return voyage she experienced weather of extraordinary severity; it abounds with expressions showing this almost from the beginning to the end of the voyage; it refers to masses of water taken aboard, and to injuries to the windlass and her chain covers forward, and to other severe injuries on deck, such as only extraordinary weather could produce. These circumstances were not made known to the witnesses and to the cross-examining counsel. The Lake Winnipeg, moreover, was not in any essentially different situation while steering the Alaska from that of disabled steam-ships in tow of other salving steamers, except that she had much more control of her own motions.

Cases of the latter kind are very numerous, many of them showing towage during weather much worse than that experienced during the four days the Lake Winnipeg was rendering her services to the Alaska. No evidence was given, drawn from these familiar instances, to support the hypothesis of the libelants' experts; nor did they substantiate their views by any proof of knowledge of similar general injury undoubtedly arising from the use of cables in towing. Again, had these injuries arisen from the service to the Alaska, they should have been apparent on the arrival of the Lake Winnipeg at

New York, and would naturally have caused an examination and repair by the libelants here. Nothing of that kind took place. On the other hand, one of the most competent experts, in the discharge of his duties to the insurance companies here, made what he deemed a sufficient preliminary examination upon the arrival of the Lake Winnipeg in New York, to determine whether or not it was necessary for her to go to the dry-dock for a more thorough survey, and for repairs. He found her in good condition, and saw no evidence of any such need of general repair as is now alleged. Other experts, as well as the one alluded to in Liverpool, testified upon the trial that the repairs to the Lake Winnipeg afterwards found necessary are only such as could be fully accounted for by the remarkable weather and strain of the ship, as described in the log on her subsequent voyage. For these reasons I must regard the evidence taken at Liverpool as insufficient to charge the Alaska specifically with the general repairs referred to. But in fixing a gross award, and in the share apportioned to the ship, full consideration will be given to her liability to such general injury, and an allowance made sufficient to cover all such damage as might naturally and reasonably be deemed incident to her peculiar service in the weather and other circumstances proved. In the case of *The City of Chester*, where the towing vessel, the Missouri, was subjected to greater strains, because the City of Chester, the vessel towed, was a much heavier vessel than the Lake Winnipeg, £4,500 were allowed by the court below.

Independently of the injuries and repairs just referred to, considering the disabled condition of the Alaska, her inability at that time to proceed safely towards her port of destination, her signals for assistance, the uncertainty as to her ability to extemporize an effective rudder, and thus reach port without at least very considerable delay, and the reasonable apprehension as regards what might happen to her in the mean time, if unaided, in the most tempestuous season of the year, and her consequent safety or security; considering also the great value of the ship and cargo, and the number of passengers on board, and the value of the Lake Winnipeg, which was employed in the service, and her cargo, and the additional danger to which they were exposed; and the promptitude, fidelity, and complete success with which the service was rendered,—there is clearly sufficient in the case to entitle the Lake Winnipeg, her officers and crew, to a substantial salvage reward.

It was practically immaterial to the Lake Winnipeg whether she was serving as a rudder in tow of the Alaska, or whether she was towing some smaller vessel astern of herself. In the absence of precise precedents to serve as a guide in fixing the amount of salvage, under the circumstances above stated, the cases of salvage services rendered to steamers whose engines, machinery, or propeller shaft were disabled, and in which the steamers, by the use of their sails and rudder, were still in a condition to make some progress on their voyage,

or to reach some port, seem to me to furnish the best analogy, and, on the whole, a tolerably fair one.

The principles which should guide the court in fixing salvage compensation have been recently stated by Mr. Justice BRADLEY in the case of *The Suliote*, 5 FED. REP. 102, as follows:

" Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune conferred without regard to the loss or sufferings of the owner, who is a public enemy; while salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage; anything short of it would not secure its objects. The courts should be liberal, but not extravagant; otherwise that which is intended as an encouragement to rescue property from destruction may become a temptation to subject it to peril."

It is clear that masters of vessels, under some apprehension of danger, but not in immediate peril, ought not to be deterred from accepting proffered aid, or from seeking it when advisable, by the fear of its unreasonable cost. The following are a few of the numerous cases of disabled machinery, in which a salvage award was given for services in towing, though the vessel had the use of her sails and rudder, and might have made some port:

*The Saragossa*, 1 Ben. 553; value of the ship and cargo about $100,000; towed by the Charles W. Lord; value of ship and cargo, $434,000; time, 36 hours; award, (9%,) $9,000.

*The Colon*, 4 FED. REP. 469; 2,686 tons; value of the ship and cargo, $480,000; towed by the Etna; 1,274 tons; value of ship and cargo, $200,000; time, four and one-half days; award, (2¼%,) $10,000.

*The Leipsic*, 10 FED. REP. 585; 2,000 tons; value, $250,000; towed by the Grecian; 1,092 tons; value, $90,000; award, (2¼%,) $5,500. The services in the case of the Leipsic were less urgent than in this.

*The City of Berlin*, 37 Law T. (N. S.) 307; 5,491 gross tons; value, $1,100,000; towed by the Spain, of 4,512 tons; value, $750,000; time three and one-fourth days; award in court below, £2,000, increased on appeal to (1 4-5%,) £4,000. (1877.)

*The City of Richmond*, 25 Mitch. Mar. Reg. 271; gross tonnage, 4,623; value, $2,500,000; towed by the Circassia; 4,272 tons; value, $750,000; time, 54 hours; award, (1⅓%,) £7,000. (1880.) The great value of the ship and cargo salved were here specially noted in making this large award.

*The Silesia*, L. R. 5 Prob. Div. 177; 3,156 tons; value, $500,000; towed by the Vaderland; 2,748 tons; value, $350,000; time, three days; award, (7%,) £7,000. (1880.) The Silesia was in a much more dangerous condition. The Vaderland went back, losing six days' time; and the loss of £500 on the charter of another vessel was included.

*The Hanover,* 28 Mitch. Mar. Reg. 81; 2,572 tons; value, $350,-000; towed by the Persian Monarch; 3,922 tons; value, $700,000; time, seven days; award, (5½%,) £4,000. (1883.)

*The Lisbonense,* 28 Mitch. Mar. Reg. 1,422; tonnage, 1,681; value, $220,000; towed by the Pascal; 1,950 tons; value, $360,000; time, six days; award, (6½%,) £3,000. (1883.)

*The Horace,* 29 Mitch. Mar. Reg. 310; 1,060 tons; value, $150,-000; towed by the Historian; 1,830 tons; value, $400,000; time, six days; award, (7½%,) £2,400. (1884.)

*The France,* 29 Mitch. Mar. Reg. 310; 4,281 tons; value, $500,-000; towed by the Marengo; 2,270 tons; value, $300,000; time, four days; award, (3½%,) £4,500. (1884.)

*The Daniel Steinman,* 19 FED. REP. 918; 1,790 tons; value, $252,-000; towed by the Republic; value, $780,000; time, 36 hours; award, (10%,) $25,000. (1884.)

In some of the above cases there were much greater urgency and greater apprehension of danger than in the case of *The Alaska;* in others, particularly in those of *The Leipsic* and of *The Colon,* there were less. Upon the diverse evidence as to the value of the Alaska, ranging from $400,000 to $750,000, I adopt that of $550,000, as her value in the condition in which she arrived in port; her freight, which was saved, $12,042, making $562,042; her cargo, it was agreed, was worth $474,533,—making the aggregate value of ship and cargo $1,041,575. The value of the Lake Winnipeg and her cargo, as above stated, was from $325,000 to $350,000. The award, which it seems to me, under the circumstances of this case, will do justice to all parties, will be an allowance of 2½ per cent. of the value of the ship and cargo as above found, amounting altogether to $26,039; of which I allow $7,000 to the master and crew, and the residue to the owners, of the Lake Winnipeg. The award is made in the form of a percentage for convenience in apportioning the share of the cargo among the great number of cargo owners; and not because a percentage, by itself considered, affords any proper criterion of a salvage award. This apportionment to the steamer, while not covering the full claims for the repairs in Liverpool, which are not satisfactorily proved to have been made necessary by her service to the Alaska alone, is, nevertheless, intended to cover such special damages as were proved, and also to include a fair allowance for such consequential damages as she might naturally be subjected to in rendering this peculiar service in tempestuous weather on the high seas, as was done in the case of *The De Bay,* 8 App. Cas. 559, and of *The City of Chester,* 9 Prob. Div. 182.

If the allowance to the master and crew in this case is less than one-half that allowed to the passenger in the case of *The Great Eastern, supra,* it will be noted, on reference to the opinion of SHIPMAN, J., that the Great Eastern was clearly in a situation of present and immediate peril, which was certainly not the case with the Alaska. The award of $15,000 in that case was properly much less than here, not-

withstanding the greater danger of the Great Eastern, because there it all went to the passenger himself for his ingenuity and services during a single day, rendered, in part, even, for his own safety; and no other property was there employed or put at risk in the salvage service; while in this case property to the amount of a third of a million dollars was employed, and exposed to more or less increased hazard. If, on the other hand, a larger sum than I have given is awarded in a very few of the cases above cited, it must be observed that the Alaska was not in immediate danger; she was not disabled in her motive power; all the towing was done by herself; the Lake Winnipeg could not have towed her, and was not desired to do so. During one-fourth of the time the Alaska proceeded alone, making about 149 miles unattended; and during most of the time the Alaska could have made her own way, needing only an escort for service in case of actual need. The amount awarded seems to me fair and liberal under the peculiar facts of this case.

Of the amount awarded to the master and crew, $2,000 is apportioned to the master, $500 each to the first officer and chief engineer, and the remaining $4,000 to the other officers and crew, in proportion to their wages.

The respondents claim that costs should not be allowed to the libelant—*First*, because there was no demand before suit; and, *second*, because 20 per cent. bonds were required. The circumstances of the case, however, are so peculiar, and a claim of salvage is necessarily so indefinite, and the defense has exhibited such a very different view of the case from that of the libelant, that it is manifest that a previous demand would have been an idle ceremony, and is therefore immaterial. No offer was made by the respondents. The amount of bonds asked from those representing the cargo does not concern the claimants of the ship. The steamer has been undergoing repairs here, and loading for a voyage, which is advertised for Tuesday next. Though not giving any bonds or stipulation for herself, she has not been obstructed or detained by the libelants an hour in the whole course of the suit. Moreover, as the Alaska commenced her discharge on the day of her arrival, and her cargo would be immediately distributed, some of it being in fact delivered on the following day, it was incumbent upon the libelants, if they would secure a salvage award against the cargo, to proceed without delay, since the ship is not liable for the salvage due from the cargo. *The Pyrennee*, Brown & L. 189; *The Col. Adams*, 19 FED. REP. 795.

There was also additional reason for commencing the suit, in order to take immediately the testimony of the witnesses who were about to depart. Though stipulations were taken on account of the cargo, to the amount of 20 per cent., there is no evidence of any controversy or any objection to give stipulations to this amount. The great bulk was covered by insurance; and the stipulation was taken upon the simple written obligation of the insurers, without sureties, and without for-

mal justification. The suit also has, at every step, been prosecuted with great diligence, so as to reach a judgment before the Alaska should need to depart. So far, therefore, is the case from presenting any evidence of harsh or oppressive conduct on the part of the libelants' proctors, that it seems to me eminently the reverse of that, both as respects the ship and the stipulators for the cargo. The libelants' proctors, in consulting the interest and convenience of both ship and cargo, have more than met all the obligations of professional courtesy; and there is no reason, therefore, for withholding the usual allowance of costs. To this I make a partial exception as respects the expense of the depositions taken at Liverpool, for the reason that the survey there was taken without notice to the respondents, and that the facts were not presented to the witnesses and the opposing counsel, in reference to the circumstances of the last trip, which had an essential bearing upon the whole examination. This portion of the costs is therefore disallowed. A decree may be entered in conformity with this opinion.